IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | 2:24-CR-083-Z-BR-(1) |
| EDELIEL ESANULSANCHAZE RAINEY, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Edeliel Esanulsanchaze Rainey's ("Defendant") Motion to Suppress ("Motion") (ECF No. 30). Defendant moves to suppress (1) all statements made by himself and his fellow passenger, Mr. Payan, during the October 24, 2024, traffic stop and (2) all evidence seized by law enforcement during a search of Defendant's vehicle following a canine free-air sniff. *Id.* at 1. Defendant argues that law enforcement did not have reasonable suspicion to initiate the instant traffic stop or to prolong the stop to conduct a canine sniff. And Defendant argues that the traffic stop constituted custodial interrogation such that Defendant and Mr. Payan's statements are inadmissible because they were not advised of their constitutional rights under *Miranda*. Defendant further alleges that the canine sniff was improperly conducted such that law enforcement did not have probable cause to search his vehicle. *Id.* at 2–5. For the reasons stated below, the Court **DENIES** Defendant's Motion.

**BACKGROUND**

**A. The First Traffic Stop**

On October 24, 2024, Trooper Abraham Pineda ("Trooper Pineda") initiated a traffic stop of a black Chrysler Pacifica minivan for following too closely behind another vehicle in violation of Texas Transportation Code Section 545.062. *Id.* at 1. The vehicle was driven by Mr. Robert

1

Payan ("Mr. Payan"), and Defendant was a passenger. *Id.* Trooper Pineda issued Mr. Payan a warning citation and then released the vehicle. *Id.* at 2.

### B. The Second Traffic Stop

A few minutes later, Trooper Mary Basye ("Trooper Basye") observed Defendant's vehicle[1] approaching from behind. ECF No. 31 at 2. Trooper Basye is a Texas State Trooper with eight years' experience with the Texas Department of Public Safety ("DPS"). Hearing Tr. at pg. 12. Trooper Basye has completed numerous drug interdiction trainings and has participated in numerous highway interdiction stops. ECF No. 31 at 2. These stops have resulted in "over one hundred seizures of controlled substances." *Id.*

As Defendant's vehicle approached from behind, Trooper Basye noticed that the vehicle had out-of-state license plates. *Id.* Defendant's vehicle then began to slow down and follow Trooper Basye's vehicle, even though Trooper Basye was driving below the speed limit. *Id.* While other vehicles traveling near Defendant's vehicle maintained their speed and passed Trooper Basye's vehicle, Defendant's vehicle remained behind Trooper Basye's vehicle. *Id.* After Trooper Basye further reduced her speed, Defendant's vehicle then moved into the left lane and passed Trooper Basye's vehicle, returning to the right lane after it passed both Trooper Basye's vehicle and a commercial truck. *Id.*

As Defendant's vehicle neared Exit 42, Trooper Basye observed Defendant's vehicle swerve toward the solid white fog line as if the vehicle might exit the highway. *Id.* But the vehicle continued driving on the white fog line without exiting. *Id.* A few seconds later, the vehicle's back tires crossed the white fog line as the vehicle drove on the improved shoulder for a few seconds in

---

[1] Although Defendant was not driving the vehicle during either traffic stop, the Court will refer to the vehicle as "Defendant's vehicle" because Defendant told law enforcement that the vehicle was his (ECF No. 31 at 4), the vehicle rental agreement was in Defendant's name. *Id.*, and Mr. Payan was not charged in connection with this offense.

violation of Texas Transportation Code Section 545.058(a). *Id.* at 3. Based on these unsteady driving patterns and the violation of Texas Transportation Code Section 545.058(a), Trooper Basye initiated a traffic stop of Defendant's vehicle. *Id.*

After Defendant's vehicle stopped, Trooper Basye approached the passenger side of the vehicle to talk to Defendant and Mr. Payan. *Id.* Both men immediately berated Officer Basye for initiating a second traffic stop. *Id.* Trooper Basye calmly informed both men that she was unaware of the prior traffic stop and asked to see the warning citation. *Id.* Trooper Basye asked Mr. Payan, the driver, whether the vehicle belonged to him. *Id.* at 3–4. Defendant then claimed that the vehicle belonged to him, later clarifying that he had rented the vehicle. *Id.*

Next, Trooper Basye asked both men about their travel plans. *Id.* at 4. Defendant said they were traveling from California to Georgia. *Id.* Defendant further informed Trooper Basye that he rented the car in California on the previous day. *Id.* The rental agreement Defendant provided Trooper Basye revealed that the vehicle was rented for a one-way trip with a 48-hour rental window. *Id.*

Trooper Basye then asked Mr. Payan to sit in her patrol car while she completed traffic stop paperwork. *Id.* After Mr. Payan entered the passenger side of Trooper Basye's patrol car, Trooper Basye asked Mr. Payan routine questions while she completed the paperwork. *Id.* Mr. Payan told Trooper Basye that Defendant was a friend "helping him get a job," but that he currently worked as an "assistant chauffeur" for Defendant. *Id.* at 4–5. Mr. Payan then explained he was traveling to Atlanta, Georgia with Defendant to "drop him [Defendant] off." *Id.* at 5. Mr. Payan then said that he and Defendant chose a rental car for the trip because (1) buses were terrible. And (2) a last-minute plane ticket was too expensive. *Id.* at 5–6. Mr. Payan then obscurely stated that "it was a last-minute thing, like I said, we've tried other ways of transporting it, it's just like, uh,

we're going to try and get a rental car." *Id.* When Trooper Basye asked Mr. Payan how he would return home to California, Mr. Payan said that Defendant would purchase a plane ticket for Mr. Payan to return home. *Id.* at 6.

Next, Trooper Basye asked whether Trooper Pineda searched their bags during the previous stop. *Id.* Mr. Payan did not directly answer the question, but when Trooper Basye asked again, Mr. Payan stated, "No, I'm pretty sure he [Defendant] opened up his bag and showed him [Trooper Pineda] what was in there, the clothes and stuff . . . because he just let us go." *Id.*

Throughout this conversation, Mr. Payan made several additional comments that were unrelated to any of Trooper Basye's questions. Mr. Payan commented on Trooper Basye's canine, Tex. *Id.* at 4. He also randomly volunteered that he had graduated from a "sheriff's academy" and that his father was a police officer with the Los Angeles Police Department. *Id.* at 5. Mr. Payan further commented on Trooper Basye's "Texas accent." *Id.* He observed that there were at least "thirty cops" on the highway that day, and Trooper Basye informed Mr. Payan that officers were conducting "heavy traffic enforcement today." *Id.* at 5–6.

Next, Trooper Basye exited the patrol car to talk to Defendant, who remained seated in the rental car. *Id.* at 6. She repeated the same questions to Defendant. *Id.* Defendant told Trooper Basye that he chose to drive to Georgia because he did not like flying. *Id.* at 7. He said he formerly worked in the entertainment industry as a rapper. *Id.* Without provocation, Defendant became defensive and claimed that Trooper Basye must have known about the prior traffic stop. *Id.* Trooper Basye told Defendant that she stooped his vehicle because Mr. Payan committed a traffic violation. *Id.*

After this, Trooper Basye returned to her patrol car. *Id.* As she reentered her patrol car, Trooper Basye noticed the odor of marijuana on Mr. Payan's clothes. *Id.* at 8. Trooper Basye then

4

directly asked Mr. Payan whether he smoked marijuana. *Id.* Mr. Payan initially denied marijuana use, but then admitted that he hadn't smoked marijuana "in more than 90 days." *Id.* Trooper Basye asked whether Mr. Payan and Defendant were transporting narcotics, firearms, or large amounts of currency in their vehicle. *Id.* Mr. Payan denied transporting any of these items. *Id.* Trooper Basye also asked Mr. Payan whether he was traveling with any luggage, and Mr. Payan claimed he was traveling with only a single sack of clothes. *Id.* at 9.

At this point, Trooper Basye asked Mr. Payan for consent to search the vehicle. *Id.* Mr. Payan refused consent. *Id.* Trooper Basye returned to the vehicle and asked Defendant for consent to search, which Defendant also denied. *Id.* Accordingly, Trooper Basye informed Defendant that she would conduct a canine free-air sniff of the vehicle. *Id.* In preparation to conduct the canine sniff, Trooper Basye asked Defendant to exit the vehicle and move away from the area. *Id.*

Trooper Basye and DPS canine "Tex" conducted a free-air sniff of the vehicle, and Tex alerted to the presence of narcotics. *Id.* at 10. By this time, additional officers had arrived at the scene. *Id.* Trooper Basye and the additional officers then searched Defendant's vehicle. *Id.* The search revealed a large, locked black bag. *Id.* at 11. After Defendant refused to open the bag, officers broke the lock and located six kilogram-sized bricks of cocaine.[2] *Id.* Defendant and Mr. Payan were arrested. *Id.*

LEGAL STANDARD

A. Traffic Stops

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. CONST. amend. IV. When a search is conducted without a warrant, the Government bears the

---

[2] Laboratory analysis later confirmed that Defendant was transporting 6,003 grams of cocaine. *See* ECF No. 31 at 12.

burden of proving by a preponderance of the evidence that the search was constitutional. *See United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

Courts must generally suppress evidence derived from an unreasonable search or seizure as the "fruit of a poisonous tree." *See United States v. Alvarado-Zara*, 782 F.3d 246, 249 (5th Cir. 2015). And because warrantless seizures are "per se unreasonable under the Fourth Amendment," any evidence seized pursuant to a warrantless search must fall within one of the "few specifically established and well-delineated exceptions" to this general rule. *See id.* (quoting *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014)). One such exception is the framework outlined in *Terry v. Ohio*, 392 U.S. 1 (1968).

Traffic stops "constitute a 'seizure' within the meaning of the Fourth Amendment." *United States v. Wallstrum*, 515 F. App'x 343, 348 (5th Cir. 2013). But such a seizure is reasonable—and thus not a violation of the Fourth Amendment—when the two-part *Terry v. Ohio* test is met: (1) the officer's action was "justified at its inception" and (2) the officer's subsequent actions were "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Terry v. Ohio*, 392 U.S. 1, 19–20 (1968)).

Reasonable suspicion "depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Navarette v. California*, 572 U.S. 393, 402 (2014). And courts "cannot reasonably demand scientific certainty where none exists. Rather, they must permit officers to make commonsense judgments and inferences about human behavior." *Kansas v. Glover*, 589 U.S. 376, 380 (2020) (internal citations omitted). The "constitutional reasonableness of the stop does not depend upon the actual motivations of the officer involved. An officer may stop a motorist for a traffic violation even if, subjectively, the

officer's true motive is to investigate unrelated criminal offenses." *United States v. Sanchez-Pena*, 336 F.3d 431, 437 (5th Cir. 2003).

Although a "defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional . . . where a police officer acts without a warrant, the government bears the burden of proving that the search was valid." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (internal citations omitted). Accordingly, the Government "bears the burden of establishing by a preponderance of the evidence [the] two elements under *Terry*." *United States v. Johnson*, No. 3:06-CR-016-D, 2006 WL 1041148, at *3 (N.D. Tex. Apr. 20, 2006) (citing *United States v. Sanchez-Pena*, 336 F.3d 431, 437 (5th Cir. 2003)); *see also United States v. Riley*, 968 F.2d 422, 424–25 (5th Cir. 1992).

### B. Canine Sniffs

Free-air sniffs by narcotics-detection dogs are so minimally invasive that they do not constitute a "search" or a "seizure" for Fourth Amendment purposes. *United States v. Place*, 462 U.S. 696, 707 (1983). "A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." *Illinois v. Caballes*, 543 U.S. 405, 409 (2005).

A warrantless search of an automobile is valid under the Fourth Amendment when a police officer has probable cause. *Almeida-Sanchez v. United States*, 413 U.S. 266, 269 (1973). And an alert by a narcotics-detection dog provides probable cause to search. *Id.* at 248; *see also Sanchez-Pena* 336 F.3d at 444.

### ANALYSIS

The court first considers whether the government has met its burden of proof as to the first *Terry* element.

### A. The traffic stop was justified at its inception.

Defendant argues that the instant traffic stop was pretextual and unjustified because Defendant committed no traffic violation and Trooper Basye lacked any reasonable suspicion. ECF No. 30 at 3. Defendant further contends that Trooper Basye lacked "any objective evidence" to stop Defendant's vehicle. *Id.*

Conversely, the Government argues that Trooper Basye's stop of Defendant's vehicle was justified because Trooper Basye observed a clear violation of Texas Transportation Code Section 545.058(a), establishing reasonable suspicion to initiate a traffic stop. ECF No. 31 at 15. The Government is correct.

For a traffic stop to be justified at its inception, an officer must have "an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, *or is about to occur*, before stopping the vehicle." *Lopez-Moreno*, 420 F.3d at 430 (emphasis added). Texas Transportation Code Section 545.058(a) bars driving on the unimproved shoulder unless one of seven exceptions is present. A vehicle may not drive on the unimproved shoulder unless the purpose is: "(1) to stop, stand, or park; (2) to accelerate before entering the main traveled lane of traffic; (3) to decelerate before making a right turn; (4) to pass another vehicle that is slowing or stopped on the main traveled portion of the highway, disabled, or preparing to make a left turn; (5) to allow another vehicle traveling faster to pass; (6) as permitted or required by an official traffic-control device; or (7) to avoid a collision." *Id.*

Here, Trooper Basye explicitly observed Defendant's vehicle swerve over the white fog line in violation of Texas Transportation Code Section 545.058(a). *See* Hearing Tr. at pg. 29–30; *see also* Gov't Ex. 6–7. And Defendant did not assert that any of the exceptions to Section 545.058(a) justified driving over the fog line in this case. *See* ECF Nos. 30, 37. Nor has the Court

ascertained from the suppression hearing testimony that any of these exceptions applied. Furthermore, Trooper Basye testified at the suppression hearing that none of the exceptions applied in this case. *See* Hearing Tr. at pgs. 55–57.

Although the issue of whether Defendant's vehicle fully crossed the line was much contested at the suppression hearing, the Court **FINDS**—based on the record evidence and Trooper Basye's testimony at the suppression hearing—that Defendant's vehicle crossed the white fog line and violated Texas Transportation Code Section 545.058(a). Accordingly, Trooper Basye had reasonable suspicion that "a traffic violation occurred" such that the traffic stop of Defendant's vehicle was justified in its inception. *Lopez-Moreno*, 420 F.3d at 430.

And as the Government correctly highlighted at the suppression hearing, courts have frequently found that reasonable suspicion exists in cases with nearly identical facts. In *United States v. McMahan*, the court found that an officer had reasonable suspicion to justify a traffic stop because an officer observed the defendant's vehicle drive on the improved shoulder for "a period of approximately three to five seconds" in violation of Texas Transportation Code Section 545.058. *See* No. 3:07-CR-152-D, 2007 WL 2470999, at *4 (N.D. Tex. Aug. 30, 2007). And in *United States v. Cisneros-Zepeda*, the Court found reasonable suspicion justifying a traffic stop based solely on an officer's suppression hearing testimony despite the fact that all video footage reviewed by the court was "inconclusive." *See* No. 2:17-CR-111-D, 2018 WL 2150410, at *6 (N.D. Tex. May 10, 2018) (finding that "although the video evidence presented during the suppression hearing is inconclusive . . . Trooper Nunez credibly testified that . . . he believed [defendant's] vehicle's taillights were inset three to five inches from the outside edge of the right rear tire, such that . . . [the vehicle's] right rear tire was actually over the fog line and on the improved shoulder"). Accordingly, the Court relies on both its own examination of the video

footage as well as the credible testimony of Trooper Basye to **FIND** that Defendant violated Section 545.058(a), establishing reasonable suspicion for Trooper Basye to initiate a traffic stop.

Furthermore—even if Trooper Basye were incorrect that Defendant violated Section 545.058(a)—courts have held that such an error does not render the traffic stop illegal. *See United States v. Grazioso*, 2006 WL 1767677, at *5, n.7 (N.D. Tex. June 28, 2006) (explaining that "when an officer is factually mistaken as to the existence of a traffic offense, that mistake does not render the stop illegal"). Rather, "the only question is whether his mistake of fact was reasonable." *United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003). "An officer's mistake of fact may provide the objective basis for reasonable suspicion or probable cause under the Fourth Amendment because of the intensely fact-sensitive nature of reasonable suspicion and probable cause determinations." *Id.* "[S]o long as the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense, the officer has probable cause to stop the driver." *United States v. Cashman*, 216 F.3d 582, 586 (7th Cir. 2000).

Accordingly, even if Trooper Basye were factually mistaken about whether the vehicle's tires swerved into the improved shoulder, the evidence establishes that she *reasonably believed* that the vehicle crossed the fog line in violation of Section 545.058(a). Video footage shows that Defendant's vehicle swerved near the fog line multiple times, and Trooper Basye credibly testified that the vehicle's tires crossed the fog line for several seconds. *See* Hearing Tr. at pgs. 29–31. Based on these facts, a reasonable officer could have concluded that the vehicle crossed the fog line in violation of Section 545.058(a).

Alternatively, Defendant's erratic swerving and inconsistent speed alone were *also* sufficient for Trooper Basye to develop reasonable suspicion that a traffic violation was "about to occur"—such that the traffic stop was justified at its inception. *Lopez-Moreno*, 420 F.3d at 430.

Trooper Basye testified at the suppression hearing that the vehicle's erratic driving and inconsistent speed led her to believe that the driver may have been distracted or fatigued—all of which gave her reasonable suspicion that a traffic violation might occur. *See* Hearing Tr. at pgs. 84–86; *see also United States v. McMahan*, No. 3:07-CR-152-D, 2007 WL 2470999 (N.D. Tex. Aug. 30, 2007) (upholding a traffic stop where the defendant violated Section 545.058 and drove in a manner which led the officer to believe the driver was possibly impaired).

* * *

Trooper Basye's stop of Defendant's vehicle was justified because the driver visibly violated Texas Transportation Code Section 545.058(a). And even if Trooper Basye were mistaken about the violation, the Court **FINDS** that Trooper Basye's belief that the driver violated Section 545.058(a) was reasonable. Furthermore, the vehicle's erratic swerving and inconsistent speed were independently sufficient to give Trooper Basye reasonable suspicion to initiate a traffic stop. For these reasons, the Court **FINDS** that the Government met its burden to demonstrate by a preponderance of the evidence that the traffic stop was justified at its inception. Thus, the Government has satisfied the first prong of the *Terry* analysis.

### B. The traffic stop was properly extended because Trooper Basye developed reasonable suspicion of additional criminal activity.

The court next addresses whether the Government has established by a preponderance of the evidence that Trooper Basye's actions after stopping Defendant's vehicle were reasonably related to the circumstances that justified the stop.

Under *Terry*'s second prong, the Court must ascertain if Trooper Basye's post-stop actions "were reasonably related to the circumstances that justified the stop, or to dispelling h[er] reasonable suspicion developed during the stop." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004). "An officer's subsequent actions are not reasonably related in scope to the

circumstances that caused h[er] to stop the vehicle if [s]he detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless [s]he develops reasonable suspicion of additional criminal activity in the meantime." *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010). If, however, "the officer develops reasonable suspicion of additional criminal activity . . . [s]he may further detain [the] occupants [of the vehicle] for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *United States v. Andres*, 703 F.3d 828, 833 (5th Cir. 2013) (quoting *Pack*, 612 F.3d at 350).

And to determine whether an officer had reasonable suspicion, the Court "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 532 U.S. 266, 273 (2002). Reasonable suspicion exists "when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Lopez-Moreno*, 420 F.3d at 430. And—importantly—courts "may not consider the relevant factors in isolation from each other." *Id.*; *see also Arvizu*, 530 U.S. at 274. Although an officer's "mere hunch will not suffice," the officer's "reasonable suspicion need not rise to the level of probable cause." *Lopez-Moreno*, 420 F.3d at 430.

Furthermore, in evaluating reasonable suspicion, courts must give "due regard to the experience and training of the law enforcement officers, to determine whether the actions taken by the officers, including the length of the detention, were reasonable under the circumstances." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004). And "courts must allow law enforcement "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* (internal citations omitted).

Here, the Court **FINDS** that the totality of Defendant and Mr. Payan's words and actions provided reasonable suspicion for Trooper Basye to suspect they were trafficking narcotics and to subsequently detain Defendant and Mr. Payan after the *initial* traffic stop concluded.[3] Specifically, the Court **FINDS** at least twelve categories relevant to the aforementioned "totality of the circumstances" analysis:

- Defendant and Mr. Payan were traveling on I-40, which is a known drug-trafficking corridor;

- Mr. Payan exhibited signs of nervousness while in Trooper Basye's patrol car;

- Defendant and Mr. Payan gave inconsistent statements about their chosen method of travel and the nature of their trip;

- Defendant and Mr. Payan were traveling in a rental car, which is the vehicle typically used in drug trafficking operations;

- The rental contract was for a one-way, 48-hour rental which is often more expensive than round-trip rentals;

- The rental vehicle had out-of-state license plates, which is typical of drug traffickers traveling long distances;

- Defendant and Mr. Payan's differing ages, manner of dress, and proffered relationship history reflected an atypical, unusual fact pattern;

- Both Defendant and Mr. Payan exhibited nervous and even aggressive demeanors during the second traffic stop;

- Mr. Payan's unfinished statements about "transporting it [presumably drugs]" and his statements about Trooper Pineda searching their bags;

- The suspected smell of marijuana;

- The minimal luggage possessed by Defendant and Mr. Payan despite the extensive nature of the trip; and

---

[3] Both in her reply brief and at the suppression hearing, Defense Counsel repeatedly highlighted to the Court that each of these factors standing alone does not support reasonable suspicion. *See* ECF No. 37 at 1–12; *see also* Hearing Tr. at pgs. 163–66. But at no time did Defense Counsel seriously contend with the possibility that—while each of these factors taken in isolation may not warrant reasonable suspicion—when taken together, these factors constitute reasonable suspicion.

13

- The manner in which the vehicle was driven (slowing down, driving under speed limit, swerving multiple times);

Hearing Tr. at pgs. 39–53; 163–66.

Specifically, Mr. Payan exhibited numerous signs while in Trooper Basye's patrol car that a reasonable officer could have construed as nervousness. Mr. Payan independently volunteered that he allegedly graduated from a "sheriff's academy" and that his father was a police officer. ECF No. 31 at 5. Mr. Payan also frequently changed the topic of conversation, commenting on Trooper Basye's "Texas accent," and asking about her dog, Tex. *Id.* at 4–5. Trooper Basye testified at the suppression hearing that Mr. Payan seemed to be sweating and experiencing indigestion throughout the conversation, all signs she interpreted as nervousness. *See* Hearing Tr. at pgs. 96–99. Here, the Court **FINDS** that Trooper Basye reasonably interpreted all these facts as signs that Mr. Payan was nervous.

Additionally, Trooper Basye reasonably interpreted the inconsistencies between Mr. Payan and Defendant's stories as a sign that Defendant was engaging in criminal activity. *See United States v. Diaz-Carreon*, 915 F.2d 951, 955 (5th Cir. 1990) (holding that "inconsistent statements are inherently suspicious). Mr. Payan told Trooper Basye that he and Defendant were driving to Georgia because a last-minute plane ticket was too expensive. *Id.* at 5–6. But Defendant told Trooper Basye that he and Mr. Payan were driving because Defendant did not like flying. *Id.* at 7. Accordingly, the Court here **FINDS** that Trooper Basye could reasonably interpret these statements as indicative of criminal activity.

And in considering the totality of the circumstances, the Court relies on Trooper Basye's eight years of experience as a State Trooper with Texas DPS, her extensive drug

14

interdiction training, and her impeccable testimony at the suppression hearing.[4] *See* Hearing Tr. at pgs. 12–14.

* * *

Taken together—and based on the totality of the circumstances—these twelve categories of facts could lead a reasonable and prudent officer to develop additional reasonable suspicion that Defendant was engaged in drug trafficking.[5] And the preponderance of the evidence overwhelmingly reflects that Trooper Basye developed additional reasonable suspicion of ongoing criminal activity during the initial stop—thus authorizing her under *Terry* and its progeny to detain Defendant and Mr. Payan while conducting a canine sniff. Therefore, the Court **FINDS** that the Government met its burden to prove by a preponderance of the evidence that Trooper Basye properly extended the stop to dispel additional reasonable suspicion that arose during the initial traffic stop. Thus, the Court **FINDS** that the Government satisfied both prongs of the *Terry* analysis such that the entire traffic stop was justified.

### C. Neither Defendant nor Mr. Payan was subject to custodial interrogation prior to the search of Defendant's vehicle.

Defendant argues that the Court should suppress all statements made by him and Mr. Payan because Trooper Basye subjected them to custodial interrogation without apprising them of their *Miranda* rights. But Defendant is wrong.

---

[4] The Court further notes that Trooper Basye was subject to approximately four hours of direct and cross examination at the suppression hearing. And despite the length of the hearing, Trooper Basye testified confidently, consistently, and accurately.

[5] At the suppression hearing, Defense Counsel repeatedly pressed Trooper Basye to identify the exact moment at which she developed reasonable suspicion. But the Court need not pinpoint an exact moment—the Court need only ascertain whether the totality of the circumstances could lead an officer to reasonably suspect ongoing criminal activity. And reasonable suspicion "is a low threshold, requiring only some minimal level of objective justification." *United States v. Wright*, 74 F.4th 722, 733 (5th Cir. 2023). Here, the record overwhelmingly reflects facts from which an officer could develop reasonable suspicion of criminal activity.

1. **Defendant cannot raise a constitutional violation on behalf of Mr. Payan.**

As an initial matter, Defendant's attempt to suppress any statements made by Mr. Payan fail because Defendant lacks standing to raise a constitutional violation on behalf of Mr. Payan. A defendant "does not have standing to raise possible violations of constitutional rights to third parties. The general rule is that one may not claim standing in the courts to vindicate the constitutional rights of a third party." *United States v. Cardenas Alvarado*, 806 F.2d 566, 574 (5th Cir. 1986); *see also Singleton v. Wulff*, 428 U.S. 106, 113–14 (1976). Here, Defendant lacks standing to challenge the admission of Mr. Payan's statements as a violation of Mr. Payan's constitutional rights. Defendant may only challenge his own statements' admissibility.

2. **Because Defendant was not subject to custodial interrogation prior to the search of his vehicle, his statements to law enforcement are admissible.**

To use "an in-custody statement against a defendant at trial, the government must demonstrate that the defendant was warned of his right to remain silent and his right to consult with an attorney" pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). *United States v. Anderson*, 755 F.3d 782, 790 (5th Cir. 2014). But for *Miranda* to apply, two requirements must be met: (1) the defendant must be in custody, and (2) the defendant must be subjected to interrogation. *See Rhode Island v. Innis*, 446 U.S. 291, 300–01(1980). Neither requirement was present in this case.

In general, the "noncoercive aspect of ordinary traffic stops . . . [means] that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). But if "a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." *Id.* at 440.

Thus, to determine whether a defendant was in custody for the purposes of *Miranda*, courts ask whether the defendant was "placed under formal arrest" or whether "a reasonable person in

the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest."[6] *United States v. Campos-Ayala*, 105 F.4th 235, 249 (5th Cir. 2024). In evaluating whether a defendant was in custody, courts specifically consider "(1) the length of the questioning; (2) the location of the questioning; (3) the accusatory or non-accusatory nature of the questioning; (4) the amount of restraint on the person's movement; and (5) any statements by the officers concerning the individual's freedom to move or leave." *Id.*

Here, neither Defendant nor Mr. Payan was restrained at any time. Although Trooper Basye asked Mr. Payan to sit in her patrol car while she completed paperwork, she clearly explained that this was standard procedure and ensured that she was able to hear him above the road noise. Gov't Ex. 8 at 20:40–21:30. Defendant remained seated in the rental vehicle throughout the entire traffic stop. In fact, Defendant requested that Trooper Basye allow him to move from the passenger seat to the driver's seat, and Trooper Basye complied. ECF No. 31 at 8. And the Court **FINDS** that none of Trooper Basye's questions were accusatory. Trooper Basye asked routine questions about the purpose of Mr. Payan and Defendant's trip, Mr. Payan's relationship with Defendant, and both men's work. *See* Gov't Ex.8 at 5:00–11:30. And Trooper Basye always answered Mr. Payan and Defendant's questions politely, despite Defendant's borderline aggressive behavior. *See* Gov't Ex. 8 at 14:30–15:45 (Trooper Basye observing to Defendant that he seemed exceptionally defensive). The Court further **FINDS** after reviewing the relevant footage that Trooper Basye's tone was friendly and conversational *at all times*. The traffic stop lasted for a total of 42 minutes—including

---

[6] At the suppression hearing, Defense Counsel introduced an affidavit from Mr. Payan which stated that "[d]ue to the circumstances and out of respect for authority, I did not feel free to end the conversation with Trooper Basye." *See* ECF No. 46-9 at 2. But the determination of custody is not subjective or case specific. It's a reasonable person standard. And here, as the Court explains, a reasonable person would have felt free to terminate the encounter such that neither Mr. Payan nor Defendant was in custody at any time during the traffic stop prior to their formal arrest.

the canine free-air sniff and subsequent search of Defendant's vehicle—which the Court further **FINDS** is a reasonable amount of time that does not amount to custody. Accordingly, neither Defendant nor Mr. Payan was in custody at any time during the traffic stop.

Because Defendant cannot assert a constitutional defense on behalf of Mr. Payan and because Defendant was not in custody at any point during the traffic stop prior to his formal arrest,[7] the Court will not analyze whether either Defendant or Mr. Payan were subject to interrogation. Both Defendant and Mr. Payan's statements to Trooper Basye are admissible.

### D. The canine sniff was properly conducted such that Tex's alert gave probable cause to search Defendant's vehicle.

Defendant argues that Trooper Basye "improperly influenced the K9 sniff, rendering the alleged alert unreliable." ECF No. 30 at 4. Defendant alleges that "the footage fails to show any distinct or objective change in the K9's behavior indicative of an alert. Instead, the K9's alleged alert appears to have been manufactured through handler cues and coaching by Trooper Basye." *Id.* at 5. Defendant further argues that "Government has failed to provide sufficient evidence to demonstrate Tex's reliability or to corroborate his behavior as a valid indication of contraband." ECF No. 37 at 19. But Defendant fails to cite any objective evidence of improper cues or coaching by Trooper Basye.[8] And Defendant is wrong about Tex's alert record. The Government's evidence and Trooper Basye's testimony demonstrates that—contrary to Defendant's assertions—Tex is an

---

[7] The Government's Response notes that after he was formally arrested, Defendant shouted "he [Payan] ain't got nothing to do with it." ECF No. 31 at 33. The Government states that even this statement by Defendant is admissible because the statement was unsolicited. And the Government is correct. *See United States v. Sabin*, 526 F.2d 857 (5th Cir. 1976) (holding that a statement was admissible because it was unsolicited and thus "clearly does not fall within the rule of *Miranda v. Arizona*").

[8] Defense Counsel's evidence here is limited to the assertion that Tex was "sporadically excitable" prior to conducting the free-air sniff. ECF No. 37 at 18. At the suppression hearing, Trooper Basye expertly explained that Tex always becomes excited because "he knows we're getting ready to make a traffic stop when we hit the rumble strip." Hearing Tr. at pg. 109. Additionally, Trooper Basye testified that when Tex recognizes the odor of narcotics, he "gets excited. He will change his normal search pattern, and then he will also, at times, bark." *Id.* at pg. 15. Tex's extensive training equipped him to reliably alert to the presence of narcotics—not to cease being a dog. And the traffic stop footage reflects that Tex proceeded with an orderly, professional free-air sniff consistent with his extensive training.

exceptionally reliable canine with an impeccable service record.

Tex has been with DPS since 2021 and worked exclusively with Trooper Basye since 2022. ECF No. 31 at 13. Tex is certified by DPS yearly and has never failed a certification attempt. *Id.* Tex was certified on October 15, 2024—less than a month before the instant traffic stop—and was certified again on December 9, 2024, barely six weeks after the stop. *Id.* Furthermore, Tex has deployed to conduct a free-air sniff over 100 times since 2022. *Id.* at 14. And between September 2023 and December 2024, Tex alerted 67 times to the presence of narcotics. *Id.* In 45 of these alerts, officers discovered narcotics, yielding a reliability rating of 67 percent. *Id.* And of the otherwise unsubstantiated alerts, 15 of these alerts were substantiated by the finding of something else, yielding a more accurate reliability rate of 89.6 percent. *Id.*

In light of these statistics—and after meticulously reviewing the entire footage of the traffic stop—the Court **FINDS** that Tex reliably alerted to the presence of narcotics in Defendant's vehicle such that Trooper Basye had probable cause to search Defendant's vehicle.

## CONCLUSION

Here, Trooper Basye had reasonable suspicion to conduct and extend the initial traffic stop. Furthermore, Trooper Basye correctly conducted the canine sniff of Defendant's vehicle, and Tex properly alerted to the presence of narcotics, providing probable cause for Trooper Basye to search Defendant's vehicle. And finally, neither Defendant nor Mr. Payan were subject to custodial interrogation throughout the traffic stop such that their statements are inadmissible. Accordingly, the Court **FINDS** the subsequent search of Davis's vehicle and the seizure of 6,003 grams of cocaine of cocaine was lawful under the Fourth Amendment. For the reasons stated above, Defendant's Motion to Suppress is **DENIED**.

**SO ORDERED.**

February 24, 2025.

_____
MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE